Court Reporting Associates, Inc.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

AARON GRUBBS,                        )
    Plaintiff,                      ) CIVIL ACTION NO.:
Vs.                                  ) 2:05-CV-604
CITY OF EUFAULA, ALABAMA,            )
    Defendant.                      )

The video deposition of AARON GRUBBS taken pursuant to the Federal Rules of Civil Procedure before Karen D. Strickland, Court Reporter and Notary Public, State at Large, at the law offices of Cobb, Shealy, Crum & Derrick, 206 North Lena Street, Dothan, Alabama, on the 21st day of November, 2005, commencing at approximately 9:00 a.m.

**CONDENSED**


PLAINTIFF'S EXHIBIT C

334.793.3673                                     334.702.9679 (Fax)

Page 42

1  page of Exhibit 3?
2     A.  Yes.
3     Q.  Exhibit 3 is a two-page document?
4     A.  Uh-huh.
5     Q.  Is that yes?
6     A.  Yes, sir.
7     Q.  When you signed the first page of
8  Exhibit 3, was the second page already attached
9  to it?
10    A.  Yes, I believe so.
11    Q.  In other words, you saw the second
12 page of Exhibit 3 at the time you signed the
13 first page?
14    A.  I believe I did. I'm not sure.
15    Q.  Have you ever seen the second page
16 before?
17    A.  Yes, I have.
18    Q.  That -- are those your words?
19    A.  Yes, sir.
20    Q.  Did you write the words on the second
21 page of Exhibit 3?
22    A.  Yes, sir.
23    Q.  What is the source of your information

Page 43

1  for the words on the second page of Exhibit 3?
2     A.  Well, what is the source of my words?
3     Q.  Right, the source of your information
4  to write that?
5     A.  Well, police officers talk to one
6  another. We talk to each other. So near about
7  all police officers knows what's going on with
8  other police officers. They won't talk it with
9  other peoples, but we do talk among ourselves.
10 So we discuss other officers and what happens
11 with them.
12    Q.  Are you telling me that in the case of
13 page 2 of Exhibit 3 that you obtained this
14 information from other police officers?
15    A.  Oh, yes.
16    Q.  Which police officers?
17    A.  I can't remember all their names now.
18 Like I say, we just talk. I don't know who said
19 what, so I can't really tell you that.
20    Q.  Can you tell me any names?
21    A.  At this time, no, sir, I can't.
22    Q.  Did you withhold any information from
23 Exhibit 3?

Page 44

1     A.  No, sir, not that I know of.
2     Q.  In other words, you put everything
3  that you knew down in your EEOC charge?
4     A.  Yes, sir, far as I can remember at
5  that time.
6     Q.  One of the things that you wrote in
7  your EEOC charge is that some of the police
8  officers that the City of Eufaula hired had
9  domestic violence charges against them?
10    A.  Yes, sir, that's correct.
11    Q.  Which officers are those?
12    A.  Well, I know that -- I spoke with one
13 former deputy sheriff, Captain Tim Marsh, that
14 he had beat his wife up and he had charges.
15 Matter of fact, he was one of the arresting
16 officers.
17    Q.  Wait, let me make sure I'm getting
18 this clear. You're saying you spoke to a deputy
19 sheriff?
20    A.  Former deputy sheriff.
21    Q.  Former deputy sheriff. What was that
22 man's name?
23    A.  Chauncey Woods.

Page 45

1     Q.  Chauncey Woods. Chauncey Woods told
2  you that Captain Tim Marsh had been arrested for
3  domestic violence?
4     A.  Yes.
5     Q.  Was that in Barbour County?
6     A.  In Barbour County.
7     Q.  Was he convicted?
8     A.  I don't know that.
9     Q.  So you don't know if Captain Marsh was
10 guilty or not guilty?
11    A.  I don't know that. You have to talk
12 to Chauncey Woods.
13    Q.  Chauncey Woods told you that he
14 arrested Captain Tim Marsh?
15    A.  He was one of the officers that was
16 out there that -- the arresting officer.
17    Q.  He was present when the arrest
18 occurred?
19    A.  Yes, yes.
20    Q.  You don't know if he was the one that
21 actually swore out the complaint or not?
22    A.  No, I don't.
23    Q.  Chauncey Woods was not -- who was he

Page 46

1  when he was -- he was just -- he's just a
2  civilian, isn't he?
3       A.   He was a deputy sheriff.
4       Q.   Well, now, though, he just works for
5  the Mark Dunning Industries --
6       A.   That's correct.
7       Q.   -- riding on the back of a garbage
8  truck, doesn't he?
9       A.   I don't know about all that. All I
10 know he works for Mark Dunning. I don't know
11 what he do.
12      Q.   Okay.
13      A.   Whether he work on the back of a
14 garbage truck is not important.
15      Q.   Right. But my point is, he's not a
16 Eufaula police officer?
17      A.   No.
18      Q.   Never has been, as far as you know?
19      A.   Not that I know of.
20      Q.   Okay. And you never confirmed that
21 Captain Tim Marsh has ever been convicted of a
22 domestic violence crime?
23      A.   No, but you can.

Page 47

1       Q.   But you didn't confirm that before you
2  put that in your EEOC charge?
3       A.   No, I didn't.
4       Q.   Do you know of any other Eufaula
5  police officer that has ever had any domestic
6  violence charges against them?
7       A.   I believe it's Sergeant Nadine Brown.
8       Q.   Sergeant Nadine Brown. That's a
9  woman?
10      A.   Yes.
11      Q.   Let me ask you this. Is Captain Marsh
12 a black male or a white male?
13      A.   White.
14      Q.   White male. Is Sergeant Brown black
15 or white?
16      A.   White female.
17      Q.   White female. And what do you know
18 about Sergeant Brown?
19      A.   Oh, I know a lot. I remember when I
20 was living in Clayton they had so -- her and her
21 husband had so many fights that it actually went
22 in the papers. And I've been looking for that
23 and I will find that article. That they was

Page 48

1  tired of going out there, there was so many.
2       Q.   Was she arrested?
3       A.   I'm sure she was.
4       Q.   You don't know that for sure?
5       A.   I don't know that for sure.
6       Q.   What law enforcement agency would have
7  arrested Sergeant Nadine Brown?
8       A.   Barbour County Sheriff's Department.
9       Q.   So I can look to the Barbour County
10 Sheriff's Department to see if that ever
11 happened?
12      A.   Yes.
13      Q.   Sergeant Nadine Brown, do you know how
14 old she is?
15      A.   No, I don't.
16      Q.   And since you don't know for sure that
17 she was arrested, you wouldn't know for sure
18 whether she was ever arrested of domestic
19 violence either?
20      A.   No, I don't.
21      Q.   Anybody else at the Eufaula Police
22 Department that you have some information that
23 leads you to believe that they have ever been

Page 49

1  arrested for domestic violence?
2       A.   Well, there's one that's a chief of
3  police now. Dexter Hammond that works for the
4  -- that work for Eufaula.
5       Q.   He once worked for Eufaula years ago?
6       A.   Yes, he did.
7       Q.   How many years ago?
8       A.   I don't know. Probably five, six
9  years ago.
10      Q.   And he's been chief in Baker Hill
11 since then?
12      A.   He's been chief in Baker Hill and now
13 he's chief of Midland City.
14      Q.   Right. So we don't know exactly how
15 long ago that was?
16      A.   No, we don't.
17      Q.   Are you saying he was convicted or
18 just arrested?
19      A.   He was arrested and convicted, but I
20 can't speak a whole lot about that, because that
21 was as a juvenile.
22      Q.   As a juvenile. And that can't be
23 considered because it's not a criminal

Page 50

1  conviction, it's a juvenile adjudication, right?
2      A.   I -- I don't know about that.
3      Q.   It's an adjudication of delinquency?
4      A.   I think robbery should be robbery
5  regardless of what it is.
6      Q.   Well, in any event --
7      A.   I would have -- I believe I would
8  rather have a officer with bad checks than
9  robbery charges.
10     Q.   Well, setting personal opinions
11 aside --
12     A.   Yes, sir.
13     Q.   -- Dexter Hammond, so far as you know,
14 does not have any adult criminal convictions?
15     A.   I don't know.
16     Q.   You don't know of any?
17     A.   No.
18     Q.   How did you find out about this
19 robbery?
20     A.   Like I told you, police officers talk
21 among themselves.
22     Q.   So that's just kind of gossip among
23 officers?

Page 51

1      A.   I don't think it's gossip.
2      Q.   Well, what is it that you know that
3  enables you to classify it as more reliable than
4  mere gossip?
5      A.   Well, I don't believe it's gossip.
6  You know, you can say it's gossip, but I don't
7  think -- I think you can check it and find out
8  if it's facts or not.
9      Q.   Well, I can't check juvenile records.
10 But what I'm asking you is what -- I mean, you
11 know, gossip is a -- I guess a term I throw out,
12 and you may obviously have the right to
13 disagree, but what I'm asking you is, what makes
14 you disagree -- did Dexter Hammond tell you
15 about it or did you see some records or you
16 just --
17     A.   Other officers talks about it, okay.
18     Q.   Okay.  But besides hearing other
19 officers say it --
20     A.   There was something that came up when
21 he became chief in Midland City about this.
22 Some things was in the papers also.
23     Q.   Were you personally a party to any of

Page 52

1  these conversations in Midland City?
2      A.   No, I wasn't.
3      Q.   Okay.  You've heard that Dexter
4  Hammond had a robbery charge as a juvenile?
5      A.   Many.  Not one, many.
6      Q.   Many robbery charges as a juvenile,
7  right?
8      A.   Yes.
9      Q.   Okay.  You don't have any documents to
10 prove that?
11     A.   No, I don't.  They hush everything up
12 in Barbour County if it deal with white peoples.
13     Q.   Besides Captain Marsh, Sergeant Brown,
14 and Dexter Hammond, do you have any information
15 concerning any other Eufaula --
16     A.   Yes, there's a lady by the name of
17 Terri.  I can't think of her last name.  I want
18 to say Owens, but I don't want to be for sure.
19 I don't want to be -- don't quote me on that.
20 That has been in trouble constantly, domestic
21 violence with the husband, since she's been
22 working with the Eufaula Police Department.
23     Q.   Is she an officer?

Page 53

1      A.   Yes, she is.
2      Q.   Has she been arrested?
3      A.   I think so.
4      Q.   You don't know for sure?
5      A.   I don't know for sure.
6      Q.   Who would have arrested her if she was
7  arrested?
8      A.   I don't know.
9      Q.   Is Terri Owens a white or black
10 female?
11     A.   She's a white female.
12     Q.   White female, okay.  What -- what part
13 of the department does she work in?
14     A.   I don't know that either.  All I know
15 is she's a patrolman.
16     Q.   A patrolman.  Do you know if she works
17 day or night?
18     A.   I don't know that either.
19     Q.   Since you're not sure about her last
20 name, I'm trying to get as much information as I
21 can so I will know what person you're talking
22 about.
23     A.   Oh, I'm sure I can get you the last

Page 54

1  name.
2  Q. Can you provide that to Mr. Newman
3  so --
4  A. Yes, I can.
5  Q. -- he can provide that to me?
6  A. Yes, I can.
7  Q. All right. Any other present or
8  former Eufaula employee that you know of or
9  believe has been arrested?
10  A. Keith Bongay (spelling), I'm not sure
11  that he was been arrested. I'm not sure about
12  that. But I know he did get into some trouble
13  with Eufaula and resigned, and Eufaula hired him
14  back recently.
15  Q. Do you know anything about that
16  firsthand?
17  A. All -- firsthand?
18  Q. Right.
19  A. No, I don't. Like I say, it's between
20  us, the police officers. I did speak to some
21  officers about it and I was told that the file
22  was sealed, and if you go in the file that they
23  would know that you have accessed it.

Page 55

1  Q. Any other Eufaula officer, either
2  present or former, that you have reason to
3  believe has been arrested?
4  A. That's all, but I intend to look for
5  more to see if I can find out more.
6  Q. So you have given me the names of five
7  people?
8  A. Yes.
9  Q. And of those five people, these are
10  people that you have heard other people say that
11  they have been either arrested or in some kind
12  of trouble with the law?
13  A. That's correct.
14  Q. For these five people you do not have
15  any firsthand personal knowledge that any of
16  that information is actually true?
17  A. No, sir, at this time I do not.
18  Q. Do you know of any present or former
19  employee of the Eufaula police department that
20  has had 39 convictions?
21  A. No, I don't know.
22  Q. Do you know of any present or former
23  employee of the Eufaula Police Department that

Page 56

1  has had 10 convictions?
2  A. I don't know.
3  Q. Do you know of any present or former
4  employee of the Eufaula Police Department that
5  has had five convictions?
6  A. I don't know.
7  Q. Do you have firsthand knowledge of any
8  present or former employee of the Eufaula Police
9  Department who has ever had even one conviction?
10  A. I don't know.
11  Q. You don't actually know how many
12  police officers the City of Eufaula hired after
13  you submitted your application?
14  A. No, sir, I don't.
15  Q. You don't know the names of any of
16  those officers?
17  A. No, I do not.
18  Q. You do not know the backgrounds on any
19  of those officers?
20  A. No, I don't.
21  Q. You do not know whether any of those
22  officers were certified or uncertified?
23  A. No, I don't. But I'm sure we can find

Page 57

1  out.
2  Q. Did you tell the EEOC that the police
3  chief is a convicted felon?
4  A. Did I tell them?
5  Q. (Nods Head).
6  A. No, I didn't.
7  Q. You didn't tell the EEOC that the
8  Eufaula police chief was a convicted felon?
9  A. No, I didn't. Somebody has some wrong
10  information.
11  
12  (Whereupon, Defendant's Exhibit 4
13  was marked for identification and
14  same is attached hereto.)
15  
16  Q. Is Exhibit 4 a copy of the EEOC's
17  notice dismissing your EEOC charges?
18  A. I think this is it.
19  Q. That appears to be it?
20  A. Yes.
21  Q. What firsthand evidence do you have
22  that your race was a factor in the City of
23  Eufaula's decision not to hire you?

Page 58

1  A.  What -- repeat the question now.
2  Q.  What -- what firsthand evidence do you
3  have? Let me ask that a different way. What
4  evidence do you have firsthand knowledge of?
5  A.  Well, first of all --
6  Q.  Let me get it out --
7  A.  Okay.
8  Q.  -- so it will be clearer. What
9  evidence do you have firsthand knowledge of that
10 your race was a factor in the City of Eufaula's
11 decision not to hire you?
12 A.  Well, first of all I live in Barbour
13 County, so I know how Eufaula is, okay. I know
14 the racial situation up there. Nobody have to
15 tell me, I know for myself. And also, I was a
16 certified officer. They have hired white folks
17 that had criminal records. So why not me?
18 Q.  Well, what -- we covered all your
19 knowledge --
20 A.  Right.
21 Q.  -- about other people and that's why I
22 wanted to limit this question to firsthand
23 knowledge, because I believe you told me you

Page 59

1  didn't have any firsthand about those other
2  people you listed. So my question is, what
3  firsthand knowledge do you have that your race
4  was a factor?
5  A.  When I -- when I talked to Tim Marsh
6  -- Tim Marsh, I could tell by his reaction he
7  really -- his speech was slow towards me. And
8  needing 10 to 12 officers, you know, looked like
9  he would have been jumping at that chance. But
10 it was sort of, Yeah, we need officers, you
11 know. And I got the feeling then, you know,
12 there was something wrong. And I hadn't -- he
13 hadn't ran no check on me so he didn't know
14 anything that I had had in my background, okay.
15 Q.  So you're saying you got an uneasy
16 feeling from talking to Captain Marsh?
17 A.  Yes, I did.
18 Q.  Do you know what else was going on in
19 Captain Marsh's day that day?
20 A.  No, I don't.
21 Q.  You don't know if he had other --
22 other things on his mind?
23 A.  Right.

Page 60

1  Q.  You don't know if he was in a hurry?
2  A.  No, I don't. No, he wasn't in a
3  hurry.
4  Q.  Well, do you know what his plan -- his
5  schedules were for that day?
6  A.  No. No, I don't.
7  Q.  Nobody ever told you that your race --
8  let me ask it this way. Nobody from the City of
9  Eufaula Police Department ever told you that you
10 were not hired because you were black?
11 A.  No.
12 Q.  Do you know anyone else who applied
13 for a job at the City of Eufaula around the time
14 you did?
15 A.  I don't know. You can pull the
16 applications and you will find out. I mean, you
17 will have to check that yourself. I don't know.
18 Q.  I'm just trying to find out what you
19 know, Mr. Grubbs.
20 A.  I don't know. I mean, I don't know if
21 applications --
22 Q.  You didn't have a buddy that you went
23 in with?

Page 61

1  A.  No.
2  Q.  Or anything like that?
3  A.  No, no.
4  Q.  You're not going to say, This guy went
5  in with me --
6  A.  No.
7  Q.  -- and he got treated this way and I
8  got treated that way?
9  A.  No.
10 Q.  Or anything like that?
11 A.  No.
12 Q.  That's why I'm -- I'm just --
13 A.  I understand.
14 Q.  I understand that you've got
15 limitations on what you know and I don't want
16 you to exceed those, but you personally do not
17 know of anyone else who applied to be a police
18 officer in Eufaula in 2004 or 2005?
19 A.  There were some, but I don't know
20 their names.
21 Q.  Do you know them personally even
22 though you don't know their names?
23 A.  No, I don't.